UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 01-52 (JRT/SRN)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, Plaintiff, | ) | GOVERNMENT'S RESPONSE TO DEFENSE MOTION FOR CHANGE IN CUSTODY CONDITIONS |
| v. | ) | |
| ABDEL-ILAH ELMARDOUDI, Defendant. | ) | |

## INTRODUCTION

The United States of America, by and through its attorneys, Rachel K. Paulose, United States Attorney for the District of Minnesota, and William H. Koch, Assistant United States Attorney, hereby files this Memorandum in Opposition to Defendant's Pretrial Motion for Change in Custody Conditions (Def. Mot.). [Docket No. 43] This Court should not reverse the considered judgment of the United States Marshal's Service and direct that Marshal's to house Mr. Elmardoudi in a less secure setting.

## STATEMENT OF FACTS

Abdel-Ilah Elmardoudi was first arrested on February 7, 2001. He was indicted by a Minnesota grand jury for engaging in "shoulder surfing" at the Minneapolis Airport – a process by which the defendant made a living traveling to the airport and memorizing the credit card numbers and/or calling card numbers of travelers using the public telephones at the airport. As was observed by law enforcement – and later confirmed by the defendant during an extensive interview as part of an attempted plea discussion – the defendant observed the fleeting use of these numbers by travelers as they used the public phones. He memorized or recorded these numbers. And he later communicated these numerical sequences to others over the telephone, so that the stolen numbers

could then be sold to and used by people around the world. While the government had identified some $800,000 in losses to AT&T alone, the defendant acknowledged losses well over that amount when considering the volume of his activity, the variety of cards he misappropriated, and the "street value" of those numbers.

Following his indictment in Minnesota, the defendant was detained under "house arrest" at a local halfway house. Through his counsel, he asked for the Court to modify the conditions of his "house arrest." The Court refused. A short time later, the defendant walked away on April 19, 2001. The grand jury, thereafter, superseded his indictment to add a count for escape.

He was later identified and charged in Michigan as being part of a "sleeper cell" following the terrorist attacks of September 11, 2001. Those charges included providing material support to terrorists, as well as conspiracy and fraud with regard to visas and identification documents.

While still in escape status and facing charges in both Minnesota and Michigan, the defendant was arrested in Greensboro, North Carolina, on November 8, 2002. At the time of his arrest, Mr. Elmardoudi had a large amount of cash on him, as well as false and fraudulent identification documents. He was transported to Michigan to face charges there.

While in Michigan, Mr. Elmardoudi was generally housed at the Federal Correctional Institution (FCI) in Milan, Michigan. FCI-Milan is a low-security facility with detention facilities for pretrial detention. FCI-Milan monitors all inmate (including pretrial detainees) telephone calls[1], monitors inmate mail, and monitors all visits. When Mr. Elmardoudi first arrived at FCI-Milan on July 19, 2004, he was placed into a General Population setting. Within five days, however, he was moved to a more restrictive Special Housing Unit (SHU). And, on December 11, 2005, Mr.

[1] Inmates are allowed to make overseas calls from FCI-Milan.

Elmardoudi lost his commissary privileges (a suspended penalty) because the staff found food Mr. Elmardoudi could not eat (because of alleged religious beliefs) in his cell – while the staff had made special meals for him not containing pork, they found the same restricted food he said he could not eat in his cell.

Shortly thereafter, Mr. Elmardoudi was moved from FCI-Milan to Iowa (to participate in some grand jury matters in that jurisdiction) from December 15, 2004, until February 25, 2005 when he returned to FCI-Milan. While at FCI-Milan, Mr. Elmardoudi's telephone calls were monitored. It was observed that he would often change the language he was speaking during the course of his calls – even on the same call. He would switch from French to Arabic, and switch between Algerian and Moroccan dialects in Arabic. This "language switching" made it more difficult to monitor his conversations.

Mr. Elmardoudi was subsequently convicted on the Michigan charges. He appealed that conviction, however, based upon an alleged violation of *Brady v. Maryland*, 373 U.S. 83 (1963). On August 31, 2004, the United States concurred with Mr. Elmardoudi's motion for a new trial for his document fraud conviction, and brought a motion to dismiss the terrorism-related count, without prejudice. On September 2, 2004, the United States District Court for the Eastern District of Michigan (Southern Division) granted the motion for a new trial and dismissed the terrorism-related count without prejudice. The United States Attorney's Office for the Eastern District of Michigan decided to not re-charge him.

Since his conviction and up to February 1, 2006, Mr. Elmaroudi was housed at FCI-Milan. The vast majority of that time was spent on the SHU.

There is no federal pretrial detention facility in Minnesota. The United States Marshal's Service has contracts with various state and local facilities to house individuals being held in pretrial detention on federal charges. These facilities include the: Sherburne County Jail, Anoka County Jail, and Minnesota Correctional Facility (MCF) in Oak Park Heights.

The Sherburne County Jail is one of the primary contract facilities used by the Marshal's Service for pretrial detention. In 2001, the Marshal's Service paid almost $3.5 million to Sherburne County to house pretrial detainees. http://www.co.sherburne.mn.us/sheriff/services/corrections.htm The jail is a 358-bed facility, with a daily population of approximately 250 men, and 27 women. *Id*. The federal pretrial detainees housed at the Sherburne County Jail are housed in a general population separate from those inmates convicted of crimes. Within the "pod," the detainees have ready access to telephones and each other. The inmates are each issued a personal identification number for charging any calls; these PINs are assigned at the time of booking and are printed on the detainee's identification bracelet. The detainees must wear their ID bracelets at all times. And they are to use their PIN numbers to place calls to ensure proper monitoring of the calls; if desired, a detainees calls that have been recorded can later be accessed through the PIN system – if a detainee uses another detainees PIN, then that detainees call will not be captured through a search using his own PIN number.[2] Sherburne County does have a Special Housing Unit in the jail for prisoners not suited for the general population due to disciplinary or protective reasons. This unit consists of mini-cellblocks which have between 4 and 8 individuals. All of these individuals share the same dayroom, where the telephone is located.

[2]This reality is true of each of the potential detention facilities.

The Anoka County Jail can house up to 232 inmates, including federal pretrial detainees. http://www.co.anoka.mn.us/departments/sheriff/jail.htm. The Anoka County Jail facilities are similar to those offered by Sherburne County.

MCF-Oak Park Heights is a maximum-security facility that opened in 1982. http://www.doc.state.mn.us/facilities/oakpark.htm It generally receives offenders transferred from other adult male institutions who are classified as maximum custody or extreme risks to the public. *Id.* It has an inmate population of about 430. *Id*. In addition to its incarcerated population, MCF-Oak Park Heights accepts pretrial detainees, including federal pretrial detainees. MCF-Oak Park Heights meets or exceeds the conditions of confinement as dictated by the American Correctional Association.

Security Captain Steven Ayers met with Mr. Elmardoudi when Mr. Elmardoudi first arrived at MCF-Oak Park Heights. Captain Ayers explained to Mr. Elmardoudi the rules, policies, and procedures to of the Administrative Segregation Unit in which Mr. Elmardoudi is housed. Captain Ayers also told Mr. Elmardoudi to let him know if he had any complaints, grievances or concerns. Mr. Elmardoudi has never shared any such concerns with Captain Ayres. While housed on the Administrative Segregation Unit, Mr. Elmardoudi has full access to the facility's medical and psychology staff, as well as its religious resource individuals. He has access to the law library via a "kite," or internal written correspondence.[3] Additionally, while at MCF-Oak Park Heights, Mr. Elmardoudi: (1) has a television and radio in his cell; (2) has access to books; (3) can make all necessary attorney calls (through Captain Ayers); (4) can make four 15-minute personal calls each

---

[3]By using a "kite," Mr. Elmardoudi describes his area of needed legal research, and a law librarian from the Minnesota Law Library in St. Paul conducts research on the issue and provides copies of needed materials.

week; (5) has full access to the canteen/commissary; and (6) has three outside, and four inside, recreation days every week. Since arriving at MCF-Oak Park Heights, Mr. Elmardoudi has not asked to discuss any issue with Captain Ayers, nor complained about any of the conditions of his detention.

## ARGUMENT

### I. MR. ELMARDOUDI HAS FAILED TO SHOW THE CONDITIONS OF HIS PRETRIAL CONFINEMENT AMOUNT TO "PUNISHMENT" IN THE CONSTITUTIONAL SENSE.

"Not every disability imposed during pretrial detention amounts to "punishment" in the constitutional sense. . . ." *Bell v. Wolfish*, 441 U.S. 520, 537 (1979). As the Supreme Court has long recognized, the United States may properly detain an individual pending trial and subject that detainee "to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution." *Wolfish*, 441 U.S. at 536. "Conditions of pretrial confinement are impermissible [only] if they constitute punishment as determined by the due process standards of the Fifth and Fourteenth Amendments." *Ferguson v. Cape Girardeau County*, 88 F.3d 647, 650 (8th Cir, 1993) (*citing Wolfish*). Stated differently, in order to challenge the conditions of pretrial detention, a detainee must show that the conditions amount to punishment or violate the Constitution.

In his motion for modification of his pretrial detention, Mr. Elmardoudi nowhere alleges the conditions imposed by the United States Marshal's Service (through his decision to detain Mr. Elmardoudi in MCF-Oak Park Heights) is to punish Mr. Elmardoudi in any way. Rather, Mr. Elmardoudi would like less restrictive conditions.

## II. THE CONDITIONS ARE RELATED TO A LEGITIMATE GOVERNMENT INTEREST.

"The critical inquiry is 'whether particular restrictions and conditions accompanying pretrial detention amount to punishment in the constitutional sense of that word.'" *Davis v. Smith*, 638 F.2d 66, 68 (8th Cir. 1981) (*quoting Wolfish*, 441 U.S. at 538). "[I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Ferguson*, 88 F.3d at 650 (*quoting Wolfish*, 441 U.S. at 539). For instance, the United States may use segregation, or solitary confinement, without running afoul of the Constitution. *Davis v. Hall*, 992 F.2d 151, 153 (8th Cir. 1993) (citation omitted); *see Hancock v. Unknown U.S. Marshal*, 587 F.2d 377, 379 (8th Cir. 1978).

In this case, the defendant is an accomplished thief. Rather than steal cars or jewelry, however, he steals numbers. He also has a history of involvement with many individuals who produce and/or have access to false documents. He speaks several languages, and he has many aliases. At the time of his arrest, he had numerous false identification documents. He has demonstrated an uncanny ability to remember long series of numbers, and to be able to relay that information to others over the phone. This innate ability – and the fact that his crime can be committed simply by having access to a telephone – coupled with his fluency in several languages that are difficult to be monitored and his contacts overseas, means the defendant could easily (1) engage in a similar fraud from within the walls of the detention facility, or (2) engage in unmonitored conversations with others outside the detention facility. These are areas of legitimate concern for the United States Marshal Service and any facility in which he is housed.

## CONCLUSION

Based upon the facts and circumstances outlined above and the proceedings to date in this matter, and as may be further discussed at the motion's hearing in this matter, defendant's motion should be denied.

Dated: April 5, 2006

Respectfully submitted,

RACHEL K. PAULOSE
United States Attorney

s/William H. Koch

BY: WILLIAM H. KOCH
Assistant U.S. Attorney
Attorney ID No. 22523X